# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

_____
|
GRACIANO INC., JOSE GRACIANO, and )
THAI LOTUS RESTAURANT, )
)
      Plaintiffs )
)
      v. )       Case No. 1:18-cv-_____
)
KHONE SANASY, AER SENESOMBATH, )
SOURASAY SENESOMBATH, ASIAN CAFE, )
ANIMA NIKONTHET, THAI & I )
CORPORATION, ACHARA WEYDT, )
WATERSTONE PROPERTIES GROUP, INC., )
SPRUCE CREEK RETAIL OUTLET, LLC, and )
SPRUCE CREEK RETAIL OUTLET GROUND )
TENANT, LLC, )
)
      Defendants )
_____)

## COMPLAINT

     NOW COME Plaintiffs Jose Graciano, Graciano Inc., and Thai Lotus Restaurant, by and through their undersigned counsel, and hereby complain against Defendants Khone Sanasy, Aer Senesombath, Sourasay Senesombath, Asian Cafe, Anima Nikonthet, Thai & I Corporation, Achara Weydt, Waterstone Properties Group, Inc., Spruce Creek Retail Outlet, LLC, and Spruce Creek Retail Outlet Ground Tenant, LLC, as follows:

### THE PARTIES

     1.    Plaintiff Graciano Inc. ("Graciano Inc.") is a Maine business corporation with a principal place of business in the Town of Kittery, County of York and State of Maine.  Graciano Inc. was formed for the purpose of operating the Thai Lotus Restaurant

1

("Thai Lotus"), a Thai food restaurant located at 340 U.S. Route 1 in Kittery, Maine. Graciano Inc. is a partner in the Thai Lotus Restaurant.

2.      Plaintiff Jose Graciano ("Graciano") is an individual residing in the Town of Waterford, County of New London, and State of Connecticut.  Graciano is the president and sole shareholder of Graciano Inc..  Graciano is also a partner in the Thai Lotus Restaurant.

3.      Plaintiff Thai Lotus Restaurant ("Thai Lotus") is a partnership formed under Maine law for the purpose of owning and operating a restaurant in Kittery, Maine for profit, and at all pertinent times hereto maintained its principal place of business in Kittery, Maine.  Thai Lotus was formed as a partnership between and among its three partners, Graciano Inc., Jose Graciano, and Khone Sanasy, whether by express intent or by the course of conduct of those three partners.

4.      Defendant Khone Sanasy ("Sanasy") is an individual residing in the Town of Kittery, County of York, and State of Maine.  Defendant Sanasay is the mother of Defendants Aer Senesombath and Sourasay Senesombath.  Defendant Sanasay also sometimes goes by the name of Khone Senesombath.  Sanasy is a partner in the Thai Lotus.

5.      Defendant Aer Senesombath ("Aer Senesombath") is an individual residing in the City of Portland, County of Cumberland, and State of Maine.  Defendant Aer Senesombath is the son of Defendant Sanasy.  Defendant Aer Sanasy also sometimes goes by the names of AE Senesombath and Sui Senesombath.  Defendant Aer Sanasy sometimes worked at the Thai Lotus.

6.      Defendant Sourasay Senesombath ("Sourasay Senesombath") is an individual residing in the Town of Winslow, County of Kennebec, and State of Maine. Sourasay Senesombath is an operator and/or manager of the Asian Cafe. Defendant Sourasay Senesombath is the son of Defendant Sanasy.

7.      Defendant Asian Cafe ("Asian Cafe") is Maine business corporation with a principal place of business in the Town of Winslow, County of Kennebec, and State of Maine. Defendant Asian Cafe is the owner of an Asian food restaurant located at 53 Bay Street in Winslow, Maine.

8.      Defendant Anima Nikonthet ("Nikonthet") is an individual residing in the Town of Winslow, County of Kennebec, and State of Maine. Upon information and belief, Nikonthet is the president and sole shareholder of the Asian Cafe.

9.      Defendant Thai & I Corporation ("Thai & I") is a Maine business corporation with a principal place of business in Kittery, Maine.

10.     Defendant Achara Weydt is an individual residing in the Town of Boylston, County of Worcester, and Commonwealth of Massachusetts. Upon information and belief, Weydt is the president and shareholder of Thai & I.

11.     Defendant Waterstone Properties Group, Inc. ("Waterstone") is a Massachusetts business corporation with a principal place of business in Needham, Massachusetts. Defendant Waterstone manages and otherwise operates the commercial real estate owned by Defendant Spruce Creek Retail Outlet, LLC and located at 340 U.S. Route 1 in Kittery, Maine.

12.     Defendant Spruce Creek Retail Outlet, LLC ("Spruce Creek") is a Maine limited liability company with a principal place of business in Kittery, Maine. Defendant

Spruce Creek is the sole owner of the commercial real estate at 340 U.S. Route 1 in Kittery, Maine where the Thai Lotus is located.

13.     Defendant Spruce Creek Retail Outlet Ground Tenant, LLC ("Spruce Creek Ground Tenant") is a Delaware limited liability company with a principal place of business in Kittery, Maine.  Commencing in June of 2017, pursuant to a ground lease it entered into with Spruce Creek, Defendant Spruce Creek Ground Tenant became the lessee in possession of the commercial real estate located at 340 U.S. Route 1 in Kittery, Maine where the Thai Lotus is located.

<u>JURISDICTION & VENUE</u>

14.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants resides or maintains a principal place of business in this judicial district, and because a substantial part of the events and omissions giving rise to the claims set forth herein occurred.

15.     This Court has original subject matter over the racketeering claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental subject matter jurisdiction over the state law claims of conversion, intentional misrepresentation, negligent misrepresentation, promissory estoppel, unjust enrichment, and civil conspiracy because those claims are so related to the federal racketeering claims that they form part of the same case or controversy.

16.     This Court has original subject matter over the federal trademark infringement claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.

4

17.    This Court has personal jurisdiction over the Defendants because each Defendants has or has had minimum contacts with the State of Maine sufficient to enable this Court to assert jurisdiction over their person consistent with the requirements of the United State Constitution and other governing authority.

## FACTS

18.    This lawsuit arises primarily out of a scheme to defraud, embezzle, steal, and seize control of a restaurant enterprise from Graciano and Graciano Inc. (hereinafter sometimes collectively referred to as the "Graciano Plaintiffs"), and from Plaintiff Thai Lotus, a partnership formed by operation of law to own and operate that business enterprise.  The scheme was orchestrated by Defendants Sanasy, Ae Senesombath, Sourasy Senesombath, Weydt, and Thai & I, and was aided, abetted and otherwise facilitated by Defendants Waterstone, Spruce Creek, and Spruce Creek Ground Tenant.

19.    At all times pertinent to this Complaint, Graciano was residing primarily in Connecticut, while Sansay was residing primarily in Maine.

20.    In June of 2014, while Plaintiff Graciano and Sanasy were in a romantic relationship together, Sanasy offered to help Graciano open a Thai restaurant in Southern Maine.  Graciano agreed to pay Sansay the sum of $20,000.00 in exchange for her assistance in opening and operating a Thai restaurant.  As additional consideration, Graciano agreed to cover all Sansay's housing and other basic living expenses during the time that she helped to open and operate a restaurant for him.  Sanasy agreed to assist Graciano with opening and operating his restaurant in exchange for this consideration.

21.    On June 12, 2014, Graciano paid Sanasy the sum of $20,000.00 in exchange for her assistance in opening and operating a Thai restaurant.  Also in exchange for her

assistance in opening and operating a Thai restaurant for him, Graciano also paid Ms. Sanasy's rent and certain other living expenses in during the period from July 2014 through December 2017.

22.     In the fall of 2014, Graciano, with help from Sanasy, located a retail space in Kittery suitable for the Thai restaurant, which was offered for lease by Waterstone on behalf of Spruce Creek.

23.     On October 17, 2014, Graciano formed a Maine business corporation, Graciano Inc., for the purpose of operating the restaurant enterprise and holding an ownership interest in that enterprise, with the knowledge and consent of Sanasy.

24.     As part of her role in assisting the Graciano Plaintiffs in opening the restaurant, Sanasy communicated with Waterstone about the lease for the retail space, and requested that the lease be placed in her name and Mr. Graciano's, not in the name of Graciano Inc.  Sanasy told Graciano that Waterstone insisted that the lease be set up that way, since she would be involved in the operation of the restaurant.

25.     In early November, 2014, the Graciano Plaintiffs and Sanasy agreed to call the enterprise the Thai Lotus Restaurant, and agreed that it would be operated by the Graciano Plaintiffs and Sanasy.

26.     On or about November 15, 2014, the parties' signed a Lease Agreement with Spruce Creek, which provided, inter alia, for a commencement date of January 1, 2015 (hereinafter the "Lease").  The tenants were listed as Jose Graciano and Khone Sansay d/b/a Thai Lotus Restaurant, and the lease was for a retail space consisting of approximately 1500 square feet and located at the Kittery Outlets Center at 340 US Route 1 in Kittery, Maine.

27.     The Graciano Plaintiffs paid all sums due under the Lease until such time as Graciano was forced out of the Premises in December by Defendants Sanasy and Aer Senesombath as set forth more fully below.

28.     Over the course of the next six months, steps were undertaken taken by the Graciano Plaintiffs and Sanasy to open the restaurant, including procuring the necessary licenses, renovating and fitting up the space, and purchasing furniture and equipment.  All start-up expenses, which amounted to not less than $100,000.00, were funded solely and exclusively by the Graciano Plaintiffs, and came principally from funds that Plaintiff Jose Graciano withdrew from his personal retirement account and from a personal loan he obtained.

29.     With the full knowledge and consent of the Graciano Plaintiffs and Sanasy, the restaurant and liquor licenses for Thai Lotus were applied for and issued in the name of Graciano Inc. d/b/a Thai Lotus Restaurant.

30.     The payroll tax account, sales tax account, and unemployment accounts were applied for and issued in the name of Graciano Inc. d/b/a Thai Lotus Restaurant.

31.     The sole bank account for the Thai Lotus was also established in the name of Graciano Inc. at Bank of America, and during the entire period from May 2015 through December 2017, that account remained in the name of Graciano Inc.  That Bank of America account in the name of Graciano Inc. was the account used for all credit and debit card transactions at Thai Lotus.  At all times pertinent hereto, only Graciano had signature power on that account, but debit cards with issued on that account to both Graciano and Sanasy.

32.     A business credit card was also obtained from Bank of America in the name of Graciano Inc. to pay for expenses related to the business.  At all pertinent times hereto, both Graciano and Sanasy had the use of a credit card on that account.

33.     A Clover Station POS machine (hereinafter the "Clover POS Machine") was purchased by the Graciano Plaintiffs for purposes of processing all credit card, debit card and cash transactions at the restaurant.

34.     The Graciano Plaintiffs contracted with two takeout and delivery services, the Take Out Guys and Eat24, to process take out transactions and make deliveries to customers of the restaurant.

35.     During the entire period of operation of the restaurant from May 2015 through December 2017, Sanasy looked after the day-to-day operations in Kittery during the workweek with guidance and instruction from Graciano in Connecticut by phone, email and text, and Mr. Graciano would be on site at the restaurant on weekends.  Graciano also communicated regularly with vendors and government agencies about the restaurant during that entire period whether he was in Maine or Connecticut, and Sanasy engaged in those communications as well.

36.     Sometime in 2015, Sanasy gave Graciano four separate checks for $10,000 each drawn from a personal account, to invest in the business as her cash contribution, but then immediately told him not to deposit the checks because there were insufficient funds in the account to cover them.  Sanasy then assured Graciano that her contribution would be in the form of working at the restaurant, which work she would do primarily in the kitchen.

37.     During the period from May 2015 through December 2017, Sanasy repeatedly requested that Graciano make additional deposits into the Graciano Inc. bank

account – or that he make payments to vendors – to cover operating expenses that apparently could not be covered out of the revenues of the restaurant.  Graciano expended tens of thousands of dollars in additional sums from his own funds on expenses related to the operation of the restaurant that were not paid for from the revenues generated by the restaurant.

38.     In January of 2016, Sanasy persuaded Graciano to loan her son, Defendant Sourasay Senesombath, the sum of $15,000.00 to invest and otherwise expend in connection with a restaurant in Winslow, Maine called the Asian Café.  Upon information and belief, that restaurant is owned by a Maine business corporation called Asian Café, which company is owned in whole or in part by Defendants Anima Nikonthet and Sourasay Senesombath.

39.     As inducement for the $15,000.00 loan, Defendant Sourasay Senesombath promised to pay Graciano interest in the amount of $400.00 per week for a period of not less than three months and not more than four months, and then to repay the principal sum in full thereafter.  Senesombath further promised Graciano a 25% stake in the business if he failed to repay the loan in full with the interest.

40.     Defendant Sourasay Senesombath paid $800.00 in interest on the loan in early 2016, but has failed to pay the remaining interest due or repay the principal.  He owes Graciano not less than $19,000.00, or alternative, a 25% ownership stake in the Defendant Asia Cafe.

41.     In the spring of 2017, Sanasy informed Graciano that she had located a buyer for the Thai Lotus who had offered to purchase it as a going concern for the total sum of $40,000 including all the furnishings and equipment.  Sanasy did not disclose the

identity of the buyer to Graciano, but he later found out it was the girlfriend of her son Defendant Sourasy Senesombath.  Sanasy told Graciano that it was a fair price based on how "poorly" the restaurant had been doing.

42.     Sanasy's representations about how poorly the restaurant was doing made no sense to Graciano based on the information available to him, which indicated that the restaurant was doing much better than represented by Sanasy.  The revenues being properly deposited into the business account did not include cash revenues that, as he later found out, were being diverted by Sanasy.  Graciano also became aware through the restaurant's surveillance footage that Sanasy was throwing lavish parties at the restaurant for her friends and family, and did not appear to be charging any money for food or drinks.

43.     Graciano told Sanasy he was not willing to sell the restaurant at a $40,000 price that he knew was far below the fair market value of the restaurant.

44.     Based on information available to the Graciano Plaintiffs during the first two years of operation of Thai Lotus, the Graciano Plaintiffs became increasingly suspicious that Sanasy was stealing and otherwise diverting revenues from Thai Lotus – particularly the cash receipts – that should have been deposited into the restaurant's business account at Bank of America in the name of Graciano Inc.

45.     The Graciano Plaintiffs also became increasingly suspicious that Sanasy was stealing and otherwise diverting additional funds that Graciano personally advanced at Sanasy's request for the supposed purpose of paying expenses of the business that Sanasy claimed were not covered by its operating revenues, in part because the expenses of the business were not getting paid and she allowed the business to rack up debts in the name of Graciano or Graciano Inc.

46.     Upon information and belief, Sanasy was diverting those cash receipts and advances into her own pocket, into one or more personal accounts maintained by her, and/or into one or more accounts in the name of her sons, Aer Senesombath and Sourasy Senesombath.  Graciano confronted Sanasy about this in the summer of 2017, and told her she must be skimming from the business.

47.     Each time Graciano confronted Sanasy about the suspicion that she was stealing and/or skimming from the business – most commonly when Sanasy told Graciano she needed additional funds from him to cover the operating expenses – she would deny that she was stealing and claim that the restaurant was simply not doing well enough to cover all the expenses, as she had done during most of the previous two years.  Sanasy thereby induced Graciano to advance still more money in the form of direct payments to vendors and/or deposits into the business account at Bank of America or other accounts used for the business.

48.     Sanasy and her son Aer Senesombath began throwing lavish parties at the Thai Lotus in the middle and latter part of 2017, giving away food and alcohol to her friends and family without charging them or collecting money for the restaurant.

49.     Graciano obtained information from an employee at the restaurant about the schemes that Sanasy and her son Aer Senesombath were orchestrating to steal money from the restaurant and the Graciano Plaintiffs.  She would frequently direct that employee, a waiter and host named Ai Sone, not to enter cash transactions through the Clover POS Machine, but to instead bring all the cash back to her in the kitchen.

50.     Also according to the employee, Sanasy and/or her son Aer would also periodically put a "Cash Only" sign on the door to the restaurant, sometimes accompanied

an indication that the credit card machine was down, even though the Clover POS Machine was not functioning working just fine.  In addition to reports from the employee of this conduct, Graciano himself caught Defendant Sanasy carrying out this scheme this when the machine was working just fine.  This had the effect of substantially increasing the number of cash transactions at the restaurant and the amount of cash Defendants Sanasy and Senesombath could steal from the business and from the Graciano Plaintiffs.

51.     Graciano obtained additional information about Defendants' fraudulent schemes by reviewing the records of the Clover POS transactions and the surveillance video, which showed that substantial amounts of cash entered in the Clover POS Machine was deposited into the business account at Bank of America, and substantial additional amounts of cash that were never entered in the Clover POS Machine.

52.     In November of 2017, Sanasy again asked Graciano for more cash, claiming she did not have enough money to pay the employees and that they were threatening to leave for nonpayment.  By this time, the Graciano Plaintiffs had more than enough information to prove that she had been stealing cash receipts from the business as well as cash advances Graciano made to the business.

53.     Graciano told Sanasy he was not advancing any more of his own funds, and instead made clear he would sell or close the restaurant if he had to, or find a new operator. Graciano knew the restaurant was generating enough revenue to pay the employees and that if the operator wasn't stealing from the restaurant, there would be more than enough money to pay the employees and cover all the other expenses.  For that same reason, Graciano knew he could find a buyer for the restaurant if he chose to sell it.

54.     Sanasy asked Graciano if he had someone else who would operate the restaurant on a day-to-day basis in her place, and he told her that he did, but refused to tell her who that was despite her request.  Shortly thereafter, Sanasy fired the chef working at the restaurant because, upon information and belief, she knew he was the person who would operate the restaurant for the Graciano Defendant.

55.     In late November 2017, Sanasy demanded that Graciano sign an agreement requiring him to pay her half of the sale price for the restaurant if it was ever sold. Although Sanasy did not provide him with a copy of that agreement, Graciano told Sanasy he would not sign such an agreement, in part because he knew she had already stolen several hundred thousand dollars from him and the business.

56.     During the months of November and December, 2017, Sanasy threatened Graciano that she would report him to the authorities for unlawful business activities – including failure to comply with tax and other regulations that she was supposed to be taking care of as operator – if he ever tried to remove her as operator of the restaurant or if he did not give her a share the proceeds from a future sale of the restaurant.

57.     Sometime in December, 2017, Sanasy told Bank of America that she had just purchased the Thai Lotus restaurant from Graciano, and opened a new checking account in her own name (d/b/a Thai Lotus Restaurant) into which all debit and credit transactions from the operation of Thai Lotus could be deposited.

58.     On or about December 13, 2017, Graciano received a letter from Attorney Patrick Bedard on behalf of Defendant Sanasy.  In that letter, Attorney Bedard contended that the Thai Lotus was a partnership between Sanasy and Graciano and that Sanasy owned a 50% interest in the business.  Bedard demanded that Graciano provide him copies of the

financials of the business and pay Sanasy half the profits from the restaurant's operation since it opened in May of 2015.  Bedard also conveyed thinly veiled threats to Graciano about actions Sanasy would take against him in regard to his alleged failure to comply with tax laws and other business regulations, if he did not pay her the money she was demanding.

59.     On or about December 19, 2017, Graciano retained Attorney Dawn Harmon of the law firm of Perkins Thompson in Portland.  On December 22, 2017, Attorney Harmon sent a letter to Attorney Bedard notifying him that Sanasy had no ownership interest in the Thai Lotus and thus no right to examine its financial records, that she had contributed no funds to the restaurant, and that she had in fact been stealing from Mr. Graciano and his business.

60.     Up to that point, Graciano reasonably believed that Thai Lotus belonged exclusively to him and his company, Graciano, Inc., and was unaware that a partnership had been created with Sanasy under Maine law.  Graciano also knew that any profits generated from the business had been stolen or otherwise misappropriated by Sanasy, by virtue of the fact that Sanasy regularly and continually asked him to contribute more money to a business she said was no generating enough revenue to cover its operating expenses.

61.     On December 22, 2017, while Graciano was watching the surveillance video in the restaurant, he observed Sanasy meeting with a salesman from Heartland Payment Systems and discussing the installation of a new credit card payment processing and point-of-sale system.  Graciano suspected that they were seeking to divert ACH transactions at the restaurant into a different bank account, because they knew the existing

Clover machine processed and deposited all transactions into the Graciano Inc. account at Bank of America.

62.     Graciano immediately called Heartland to report what was going on. Heartland reported to Graciano that they were told by Sanasy that Graciano had disappeared and they had taken over the restaurant, and that Heartland had already opened a new account with her.  Sanasy can be heard making similar representations on the video to the sales representative.  Graciano told Heartland that he was still the owner of Thai Lotus and that what they were doing was illegal.  Heartland assured Graciano that they would contact the sales representative immediately and let them know what was going on.

63.     On or about December 23, 2017, Graciano confronted Sanasy and her son at the restaurant about changes they were trying to make to the point of sale credit card processing system.  He also confronted them about stealing from the business and from him.  The son, Defendant Aer Senesombath, told Graciano that if he didn't leave the Premises immediately, or if he ever returned, he would break his legs.  Graciano became immediately fearful of bodily injury, left the Premises and did not return until he was able to get police assistance.

64.     On December 27, 2017, while watching surveillance video in the restaurant, Graciano observed Sanasy and son, Defendant Aer Senesombath, talking on the telephone to a representative from Bank of America about problems they were having processing credit card transactions with the existing Clover machine.  Graciano suspected that, after Heartland had terminated their account, that they were seeking to use the existing machine to process funds into a different account at Bank of America.

65.    On or about December 28, 2018, Graciano went in person to the Kittery Police Station to make a criminal complaint against Defendant Sanasy and her son, Defendant Aer Senesombath.  He reported the following to Officer Brian Cummer and a detective who was also present: (a) that he had observed Sanasy and her son on surveillance video messing around with the credit card processing station and talking to banks and vendors in an effort to change the account information in order to divert and otherwise steal the restaurant's ACH receipts; (b) that Sanasy had diverted and otherwise stolen cash from the operations of the business and funds he advanced to the business; (c) that Aer Senesombath was selling drugs out of the restaurant; and (d) that Aer Senesombath had threatened to break Graciano's legs if he did not immediately leave the restaurant or if he ever came back.  Graciano presented documentation to the police of the conduct he reported in subsections (a) and (b) hereof, including electronic documentation from his iPad.  The case number assigned by the Kittery Police Department was 17-KIT-1983-OF.

66.    A few days later, Graciano arranged for a police officer to meet him at the restaurant for assistance in regaining control of the restaurant from Sanasy and Senesombath, because he did not feel safe going alone.  The officer escorted him into the Premises, proceeded to tell Sanasy and Senesombath that they needed to leave the Premises.  Sanasy refused to leave, but then her son came out and was able to persuade her to leave the restaurant.  They went out the back door of the restaurant.

67.    Sanasy's attorney, Patrick Bedard, arrived shortly thereafter, and the police arrived shortly after he got there.  Sanasy and her son returned to the restaurant as well. Bedard showed the police and Graciano the copy of the lease to the space, which listed the

tenants as "Jose Graciano and Khone Sanasy, d/b/a Thai Lotus Restaurant."  The police informed Graciano that because Sanasy was a co-tenant on the lease, they could not remove her as a trespasser.

68.     Given the threats of serious physical harm that had been communicated to him by Sanasy's son, and being unable to remove Sanasy or her son from the physical space due to the way in which the lease had been drafted, Graciano left the Premises and did not return.

69.     The Graciano Plaintiffs made efforts through their attorney over the next few weeks to try to regain control of the restaurant, which were unsuccessful.

70.     In early January, Graciano contacted Bank of America to let them know he thought Ms. Sanasy was trying to re-route ACH transactions from the Thai Lotus into a new or different account.  The representative with whom he spoke, Olguita Correa, told Graciano that Sanasy had reported to Bank of America in early December that she had purchased the restaurant from him.

71.     Graciano informed Bank of America that he had not sold his restaurant to Sanasy or anyone else, and reported that she had no authority to re-route ACH transactions from sales at the restaurant.

72.     Graciano subsequently learned that Sanasy did the very same thing at Citizens Bank, again trying to open new checking account in her own name (d/b/a Thai Lotus Restaurant) into which all debit and credit transactions from the operation of Thai Lotus could be deposited.

73.     Also in early January, 2018, Graciano discovered that Sanasy had stopped accepting credit and debit card transactions at the restaurant altogether.  Those transactions

were linked to the Graciano Inc. account at Bank of America over which Sanasy had no access, and Sanasy's efforts to reroute those transactions were unsuccessful.  Sanasy posted a sign on the door that read "Cash Only—Credit Card Machine Broken."

74.     In late December 2017 and/or early January 2018, Sanasy also told one of the take and delivery contractors, the Take Out Guys, that she had purchased and/or taken over the Thai Lotus from the Graciano Plaintiff and that all monies and receipts collected should be paid to her.

75.     On February 16, 2018, the Graciano Plaintiffs, through counsel, notified the property management agent for the landlord, Waterstone, that Sanasy had hi-jacked the restaurant and forced him out of the space.  He further notified Waterstone that Sanasy was trying to sell the restaurant without his approval to an unidentified third party and assign the lease to that party.

76.     The Graciano Plaintiffs obtained a draft lease assignment from the property management agent, and thus learned that Sansay was seeking to sell the Thai Lotus restaurant and assign the lease to Achara Weydt, a woman from Boylston, Massachusetts who owned and operated a Thai restaurant in Whitinsville, Massachusetts.

77.     On or about February 23, 2018, the Graciano Plaintiffs, through counsel, notified Achara Weydt that Sanasy had hi-jacked Thai Lotus and forced him out of the space, and that she was unlawfully trying to sell the Thai Lotus to her and assign the lease. Counsel further notified and warned Weydt that Sanasy had no right to do so without his authority, which he had not given and would not give.

78.      On or about February 25, 2018, a meeting took place at the Thai Lotus restaurant between and among Sanasy, Weydt and an agent for Waterstone named Alex

18

White.  Notwithstanding the fact that Weydt and Waterstone had been notified of Sanasy's unlawful activities and that she did not have the right to sell the business, they proceeded to discuss arrangements to facilitate the same.

79.    Now that Graciano had found out about the unlawful assignment of the lease, Sanasy, Weydt and Waterstone all shifted gears toward a termination of the lease and the issuance of a new lease to Weydt and/or her company.

80.    Upon information and belief, Waterstone's agent assured Sanasy and Weydt that one or both of them would get a lease to the premises as soon as Graciano's interest in the space could be terminated through a termination of the existing lease.  Based on that assurance, Weydt gave Sanasy a substantial payment toward the purchase of the Thai Lotus.

81.    During a meeting at Waterstone's office in Needham, Massachusetts on March 2, 2018, Waterstone's President, Neal Shalom, represented to Graciano and his counsel that he had no knowledge that Sanasy was attempting to sell the Thai Lotus restaurant without his authority to Achara Weydt, and denied that his agent, Alex White, was present at a meeting to help facilitate that unlawful and unauthorized sale on February 25, 2018.

82.    During the meeting on March 2, 2018, Waterstone's President, Neal Shalom, represented to Graciano and his counsel a willingness to consider an arrangement that would allow Graciano to regain control of Thai Lotus and remain in the Kittery location, and invited him to make a proposal.  In fact, Shalom knew that Waterstone had already promised to Defendants Sanasy and Weydt that they would be given a new lease to

19

the existing location as soon as the current lease could be terminated so as to terminate Plaintiffs' rights in the space.

83.     On March 9, 2018, Defendants Waterstone and Spruce Creek (the "Waterstone-Spruce Creek Defendants") terminated the lease by notice to Graciano and Sanasy based on allegations of nonpayment of rent.

84.     On or about March 14, 2018, the Waterstone-Spruce Creek Defendants filed a complaint for forcible entry and detainer against Graciano and Sanasy in Maine District Court in York.

85.     On March 15, 2018, Weydt formed Thai & I Corporation ("Thai & I), and designated Sanasy's son, Sourasy Senesombath, as its registered agent.  Upon information and belief, Weydt is the president and sole shareholder of Thai & I.

86.     At some time between March 15 and April 27, 2018, the Waterstone-Spruce Creek Defendants entered into a lease agreement with Achara Weydt and/or Thai & I.

87.     On April 27, 2018, the Waterstone-Spruce Creeks Defendants obtained a judgment for possession of the premises against Graciano and Sanasy, as well as a writ of possession to the premises.  Sanasy never contested the proceeding and at all applicable times, together with her counsel, was actively assisting the Waterstone-Spruce Creeks Defendants in obtaining judgment.

88.     The writs of possession were served upon Graciano and Sanasy, but Sanasy's possession of the premises continued until such time as the possession was taken over by Weydt and her company, and Sanasy continued thereafter to be involved in operation of the restaurant.  Upon information and belief, the Waterstone-Spruce Creek Defendants never retook physical possession of the premises following the termination of

the lease, which instead went directly from Sanasy to Wedyt with the agreement, assistance, aiding, abetting, and facilitation of the Waterstone-Spruce Creek Defendants.

89.     From March 2018 until May 10, 2018, Sanasy and Weydt operated the restaurant under the name Thai Lotus and/or Thai Lotus Restaurant, which are registered marks of Plaintiff Graciano Inc.  Commencing on May 10, 2018, Sanasy and Weydt began to operate the restaurant under the name Thai & I Restaurant.

90.     Upon information and belief, some of the monies taken from the Graciano Plaintiffs through the Defendants' pattern of theft, fraud and racketeering were used to renovate and reopen the Kittery Restaurant under the name "Thai and I," and to pay rent to Defendants Waterstone, Spruce Creek and/or Spruce Creek Ground Tenant.

91.     Upon information and belief, other monies taken from the Graciano Defendants were invested by Defendants Sanasy and Sourasay Senesombath in a restaurant called the Capital Thai Kitchen & Bar in Exeter, New Hampshire.

92.     As a result of the actions and omissions of the Defendants, the Plaintiffs were never able to re-enter the premises and retake control of the Thai Lotus after December 28, 2017.  All the assets of the Thai Lotus Restaurant and those of the Graciano Plaintiffs contributed thereto, as well as the revenues generated therefrom, were stolen, converted and otherwise misappropriated by Defendants Khone Sanasy, Aer Senesombath, Sourasy Senesombath, Achara Weydt and Thai and I, with the agreement, assistance, aiding, abetting, and facilitation of the Waterstone-Spruce Creek Defendants.  The Graciano Plaintiffs and Plaintiff Thai Lotus restaurant have suffered several hundreds of thousands of dollars in losses and other damages as the proximate result thereof.

## COUNT I
### *Violations of 18 U.S.C. §§ 1962(c) and 1962(d)*
### *Racketeering*
(*Against Defendants Khone Sanasy, Aer Senesombath,*
*Sourasay Senesombath, Achara Weydt, and Thai & I Corporation*)

93.     Plaintiffs repeat and restate the allegations in paragraphs 1-92 as if fully set forth herein.

94.     At all times pertinent herein, Defendants Khone Sanasy, Aer Senesombath, Sourasay Senesombath, Achara Weydt, and Thai & I Corporation (hereinafter the "Count I Defendants") were each an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

95.     At all times pertinent herein, the Count I Defendants were associated in fact within the meaning of 18 U.S.C. § 1961(4) so as to constitute an enterprise within the meaning of that statute (hereinafter the "Sanasay-Senesombath-Weydt Enterprise").  The Sanasay-Senesombath-Weydt Enterprise is an enterprise engaged in or whose activities affect interstate commerce, including the conduct of restaurant operations in Maine and New Hampshire and the movement of money across state lines and across interstate wires to facilitate such operations.

96.     At all pertinent times herein, the Defendants participated in the conduct of the affairs of the above-described enterprises, directly and/or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including but not limited to multiple separate acts of extortion, wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, and transporting stolen property in violation of 18 U.S.C. § 2314, as set forth more particularly herein and in the Fact section of this Complaint.

97.     Among other racketeering activity constituting extortion under Maine law, Defendant Sanasy threatened to report Graciano to the authorities for unlawful business

activities – including failure to comply with tax and other regulations that she was supposed to be taking care of as operator – if he ever tried to remove her as operator of the restaurant or if he did not give her an ownership interest in the company or share the proceeds from a future sale of the restaurant.

98.     Among other racketeering activity constituting wire fraud in violation of 18 U.S.C. § 1343, the Count I Defendants devised a scheme or artifice to defraud Plaintiff, and to obtain money or property from Plaintiff by means of false or fraudulent pretenses, representations or promises that Plaintiff reasonably relied upon to its detriment, and which false or fraudulent pretenses, representations or promises were transmitted or caused to be transmitted by wire communication in interstate commerce, including but not limited to telephone, email and text message, for purposes of executing said scheme or artifice.  The false or fraudulent pretenses, representations or promises that Plaintiffs reasonably relied upon to their detriment include, without limitation, those set forth in Count III hereof.

99.     Among other racketeering activity constituting bank fraud in violation of 18 U.S.C. § 1344, the Defendants Sanasy and Aer Senesombath made false representations to Bank of America and certain credit card processing vendors for the purpose of gaining control over funds or monies belonging to the Plaintiffs, which representations included the representation that Sanasy had purchased the Thai Lotus from the Graciano Plaintiffs and that they were no longer involved in the business.

100.     Among other racketeering activity constituting transporting stolen property in violation of 18 U.S.C. § 2314, the Count I Defendants stole, converted and otherwise misappropriated for their own use and benefit hundreds of thousands of dollars belonging to Plaintiffs, and transported some of those monies, including but not limited to cash,

across state lines in multiple separate trips from Maine to New Hampshire and Maine to Massachusetts during the period from May of 2015 through May 2018.

101.    The interstate transportation was occasioned in part by, and partly for the purpose of, financing the opening of a new restaurant in Exeter, New Hampshire, and bringing back cash from Massachusetts derived from the Count I Defendants' fraudulent sale of Plaintiffs' restaurant to Defendant Achara Weydt.

102.    The Count I Defendants also used interstate wires to transport stolen property, including by their unauthorized use of a business credit card, their deposit of stolen funds into one or more bank accounts, and their diversion and/or attempted diversion of ACH transactions from the restaurant into one or more bank accounts in their name.

103.    All racketeering activity alleged herein was conducted through one or more of the enterprises described herein, including but not limited to the Sanasy-Senesombath-Weydt Enterprise.

104.    As a result of the unlawful racketeering conduct of the Count I Defendants set forth herein, Plaintiffs were deprived of their property interests.

105.    The Count I Defendants aided and abetted one another in their unlawful racketeering activities and, in violation of 18 U.S.C. § 1962(d), conspired to engage in unlawful racketeering activities by agreeing with one another to engage those unlawful racketeering activities.

106.    As a direct and proximate result of the Count I Defendants' unlawful racketeering activities, their aiding and abetting of one another's racketeering activities, and/or their conspiracy to engage in racketeering activities, Plaintiffs have suffered direct

24

and consequential harm in the amount of several hundred thousand dollars, and are entitled

to treble damages therefor as well as reasonable attorney's fees and costs pursuant to

18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.     Order that the Count I Defendants return at once to the Plaintiffs all

property and assets in Defendants' possession, custody or control that belong to the

Plaintiffs and/or over which Plaintiff has a right of possession and control;

B.     Award such compensatory damages to Plaintiff as are appropriate,

plus interest and costs;

C.     Award treble damages and attorney's fees and costs to Plaintiff

pursuant to 18 U.S.C. § 1964(c);

D.     Award punitive damages to Plaintiff where appropriate; and

E.     Award such other and further relief as is just and proper.

## COUNT II
### *Conversion*
(*Against Defendants Khone Sanasy, Aer Senesombath,
Sourasay Senesombath, Achara Weydt, and Thai & I Corporation*)

107.    Plaintiffs repeat and restate the allegations in paragraphs 1-106 as if fully

set forth herein.

108.    At all pertinent times hereto, Plaintiffs had the exclusive right to possession,

ownership and control of, *inter alia*, the following property: (a) all cash and other proceeds

generated from the operation of Thai Lotus in Kittery, Maine; (b) all equipment,

furnishings, and leases associated with the Thai Lotus; (c) all cash and other monies loaned

or otherwise advanced for the benefit of Thai Lotus in Kittery, Maine; (d) all funds

contained in any bank accounts in the name of Graciano and/or Graciano Inc.; and (e) trademarks, designs and logos for Thai Lotus.

109.    As set forth in the Fact sections of this Complaint, the Count II Defendants converted, stole, transferred and/or misappropriated for their own use and benefit, property with respect to which Plaintiffs had the exclusive right to possession, ownership and control.

110.    At no time were any of the Count II Defendants authorized or entitled to convert, transfer or appropriate for their own personal use and benefit any of the property with respect to which Plaintiffs had the exclusive right to possession, ownership and control.

111.    The Count II Defendants have failed to return to Plaintiffs any of the converted, stolen, transferred and otherwise misappropriated property with respect to which Plaintiffs had the exclusive right to possession, ownership and control.

112.    As a direct and proximate result of the Count II Defendants' unauthorized, wrongful and tortious conversion of Plaintiffs' property, Plaintiffs have suffered direct and consequential harm, including but not limited to economic and monetary losses of several hundred thousand dollars, and damages to Plaintiffs' reputation and good will in the community.

113.    The wrongful actions of the Count II Defendants set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such wrongful actions.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.     Order that Defendants return at once to the Plaintiffs all property and assets in Defendants' possession, custody or control that belong to the Plaintiffs and/or over which Plaintiff has a right of possession and control;

B.     Order Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs;

C.     Order that Defendants pay punitive damages to the Plaintiffs; and

D.     Award such other and further relief as is just and proper.

## COUNT III

### *Intentional Misrepresentation*
*Against Defendants Khone Sanasy, Aer Senesombath and Sourasay Senesombath*

114.    Plaintiffs repeat and restate the allegations in paragraphs 1-113 as if fully set forth herein.

115.    Defendants Sanasy, Aer Senesombath, and Sourasy Senesombath (the "Count III Defendants") made a series of false and/or misleading representations and assurances to Plaintiffs in person, by phone, by email and by text message, including, without limitation, the following:

a.     that they were experienced restaurant operators and/or managers.  In fact, the Count III Defendants were experienced thieves that knew little about effective restaurant management and regulatory compliance;

b.     that they would manage the day-to-day operations and management of Thai Lotus, including: the hiring, payment and firing of employees; retaining and otherwise dealing with vendors, suppliers and contractors; bookkeeping and accounts payable and receivable; local, state and federal regulatory compliance; and quarterly and annual tax filing, payment and reporting requirements, among other affairs associated with

operation of the restaurant, which false and/or misleading representations and assurances were made on a regular basis to Plaintiffs during the period from March 2015 until December 2017.  In fact, the Count III Defendants intended to use, and did use, Sanasy's position as the day-to-day operator and/or manager of the restaurant to defraud Plaintiffs and steal money and property belonging to Plaintiffs;

      c.     that the Count III Defendants would pay and were paying the expenses owed by Plaintiff in connection with the restaurant's operations as they became due, including but not limited to payroll tax liabilities, which false and/or misleading representations and assurances were made on a regular basis to Plaintiffs during the period from March 2015 until early December 2017.  In fact, the Count III Defendants were not paying all the expenses of the restaurant, in furtherance of their scheme to defraud Plaintiffs and steal money and property belonging to Plaintiffs;

      d.     that Thai Lotus had less revenue than were actually being generated by its operation, and more expenses than were actually being incurred, which false representations were made on a regular basis to Plaintiffs during the period from March 2015 through December 2017.  In fact, the Count III Defendants were stealing revenues from the operation of the business, and monies loaned or advanced by Plaintiffs for the business, rather than paying expenses of the business or allowing Plaintiffs to realize a profit;

      e.     that the Thai Lotus was only worth $40,000.  In fact, the Count III Defendants knew it was worth more than that, because they were skimming all the profit and then some, and seeking to cause financial harm the business (or conceal its

profitability) so that they could purchase or take over ownership of the restaurant through a family member or other third party buyer.

       f.     that they were not in fact stealing or skimming money from the Plaintiffs; and

       g.     that Defendant Sourasy Senesombath intended to repay the sum of $15,000.00 borrowed from Plaintiff Graciano and/or give him a 25% ownership interest in the Asian Café if he did not do so.

116.    At the time of the above-described representations and assurances to Plaintiffs, the Count III Defendants knew that those representations and assurances were false and/or misleading.

117.    As a direct and proximate result of Plaintiffs' reasonable reliance on the Count III Defendants' false and misleading representations and assurances, Plaintiffs have suffered direct and consequential harm, including but not limited to monetary losses of several hundred thousand dollars, and damage to Plaintiffs' reputation and good will in the community.

118.    The fraudulent actions of the Count III Defendants set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such fraudulent actions.

WHEREFORE, Plaintiffs respectfully requests that this Court:

       A.     Order that Defendants return at once to the Plaintiffs all property and assets in Defendants' possession, custody or control that belong to the Plaintiffs and/or over which Plaintiff has a right of possession and control;

B.      Order Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs;

C.      Order that Defendants pay punitive damages to the Plaintiffs; and

D.      Award such other and further relief as is just and proper.

## COUNT IV
### Breach of Contract
### (Against Defendant Sourasy Senesombath and the Asian Café)

119.    Plaintiffs repeat and restate the allegations in paragraphs 1-118 as if fully set forth herein.

120.    Defendants Sourasy Senesombath and Asian Café (the "Count IV Defendants") entered into a binding agreement to borrow and repay the sum of $15,000.00 from Plaintiff Graciano, with interest, and pledged a 25% interest in the Asia Café as security therefor.

121.    The Count IV Defendants breached that agreement by failing to repay the principal and interest in full to Plaintiff Graciano, and by failing to give him a 25% ownership interest in the restaurant.

122.     As a direct and proximate result of the breach of the agreement by the Count IV Defendants, Plaintiff Graciano has suffered harm.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Order the Count IV Defendants to pay such compensatory and consequential damages to Plaintiff Graciano as are appropriate, plus interest and costs;

B.      Award Plaintiff Graciano a 25% ownership interest in the Asian Café; and

C.      Award such other and further relief as is just and proper.

## COUNT V
### *Promissory Estoppel*
### *(Against Defendant Sourasy Senesombath and the Asian Café)*

123.    Plaintiffs repeat and restate the allegations in paragraphs 1-122 as if fully set forth herein.

124.    Defendants Sourasy Senesombath and Asian Café (the "Count V Defendants") induced Plaintiff Graciano to loan them the sum of $15,000.00 based on a promise to repay that sum to Plaintiff Graciano, with interest, by pledging a 25% interest in the Asia Café as security therefor.

125.    Plaintiff Graciano relied by the promises of the Count V Defendants by loaning them the sum of $15,000.00.

126.    The Count V Defendants failed to repay the principal and interest in full to Plaintiff Graciano, or to give him a 25% ownership interest in the restaurant, and as a result, Plaintiff Graciano suffered detriment.

127.    Equity requires enforcement of the promises made by the Count V Defendants.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Order the Count V Defendants to pay such compensatory and consequential damages to Plaintiff Graciano as are appropriate, plus interest and costs;

B.    Award Plaintiff Graciano a 25% ownership interest in the Asian Café; and

C.    Award such other and further relief as is just and proper.

## COUNT VI

### *Unjust Enrichment*
### *(Against Defendant Sourasy Senesombath, the Asian Café and Anima Nikonthet)*

128.    Plaintiffs repeat and restate the allegations in paragraphs 1-127 as if fully set forth herein.

129.    Defendants Sourasy Senesombath and Asian Café (the "Count VI Defendants") induced Plaintiff Graciano to loan them the sum of $15,000.00 based on a promise to repay that sum to Plaintiff Graciano, with interest, by pledging a 25% interest in the Asia Café as security therefor.

130.    Plaintiff Graciano relied by the promises of the Count VI Defendants by loaning them the sum of $15,000.00.  The Count VI Defendants used these funds for the business of the Asian Café, directly benefited from the use of these funds, and continue to benefit from such funds through the operation of the Asian Café as a going concern.

131.    The Count VI Defendants failed to repay the principal and interest in full to Plaintiff Graciano, or to give him a 25% ownership interest in the restaurant, and as a result, Plaintiff Graciano suffered detriment.

132.    The Count VI Defendants have been unjustly enriched by the $15,000.00 borrowed from Plaintiff Graciano without repayment thereof.

133.    Equity requires the Count VI Defendants pay to Plaintiff the full extent of the monetary amount or value by which they have been unjustly enriched.

      A.    Order the Count VI Defendants to pay such compensatory and consequential damages to Plaintiff Graciano as are appropriate, plus interest and costs;

      B.    Award Plaintiff Graciano a 25% ownership interest in the Asian Café; and

C.     Award such other and further relief as is just and proper.

## COUNT VII
### *Violation of 15 U.S.C. § 1114 et seq.*
### *Trademark Infringement*

134.    Plaintiffs repeat and restate the allegations in paragraphs 1-133 as if fully set forth herein.

135.    Plaintiffs were at all times pertinent hereto the lawful owners of the marks "Thai Lotus Restaurant" and "Thai Lotus" marks under Maine law (the "Thai Lotus Trademarks"), and used those marks during the entire period from May 2015 through December 2017 to identify its goods and services and distinguish them goods and/or services sold by others.

136.    Plaintiffs Graciano Inc. and Thai Lotus Restaurant prominently displayed the Thai Lotus Trademarks their marks inside and outside the retail space in Kittery, Maine where the restaurant operated, in print and online advertisements, through general internet marketing, and in the sale of goods with the marks clearly depicted thereon.

137.    Defendants Sanasy, Aer Senesombath, Sourasy Senesombath, Achara Weydt and/or Thai & I Corporation (hereinafter the "Count VII Defendants") have infringed Thai Lotus Trademarks in commerce by marketing, displaying, and selling goods and services at the retail restaurant space in Kittery, Maine using the Thai Lotus Trademarks, without authority or license from the Plaintiffs, during the entire period from December 28, 2017 through May 31, 2018.

138.    The Count VII Defendants' use of the Thai Lotus Trademarks has caused and is likely to cause confusion as to an association, sponsorship, or endorsement of the goods and services marketed and/or sold by the Count VII Defendants.

33

139.    The Count VII Defendants' use of the marks that are the same or confusingly similar to the Thai Lotus Trademarks has caused and is likely to cause confusion, to cause mistake, or to deceive the purchasing public.

140.    The Count VII Defendants' actions are intentional and willful.  The Count VII Defendants were on notice of the Plaintiffs longstanding use of Thai Lotus Trademarks during the entire period of their infringement thereof.

141.    Despite their actual notice of the protected marks, the Count VII Defendants have refused to cease the infringing activity.

142.    As a direct and proximate result of the Count VII Defendants' infringement actions, the Plaintiffs suffered damage to their reputation and goodwill, injury to its past and potential customer base, and a loss of revenue in an amount not yet determined.

143.    The Plaintiffs are entitled to recover the Count VII Defendants' profits and reasonable royalties for the infringing use of the Thai Lotus Trademarks, as well as damages, all of which may be trebled as the result of the Count VII Defendants' willful conduct, as set forth in 15 U.S.C. § 1117.

144.    The Count VII Defendants' actions render this an exceptional case, further entitling the Plaintiffs to recover its attorneys' fees and costs of suit as set forth in 15 U.S.C. § 1117.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Award to the Plaintiffs an amount equal to the profits and reasonable royalties for the infringing use of the Graciano Inc. Trademarks by the Defendants, pursuant to 15 U.S.C. § 1117;

B.      Award such compensatory damages to Plaintiff as area appropriate, plus interest and costs, pursuant to 15 U.S.C. § 1117;

C.      Award treble damages and attorney's fees and costs to Plaintiff pursuant to 15 U.S.C. § 1117; and

D.      Award such other and further relief as is just and proper.

## COUNT VIII
### Expulsion of Partner by Judicial Determination
### 31 M.R.S.A. §§ 1061(5)
### Against Defendant Khone Sanasy

145.    Plaintiffs repeat and restate the allegations in paragraphs 1-144 as if fully set forth herein.

146.    As a result of Defendant Khone Sanasy's misconduct conduct set forth in this Complaint, including without limitation the Fact section and Counts I-III hereof, legal grounds have been established for the expulsion of Sanasy as a partner of Thai Lotus Restaurant by judicial determination pursuant to 31 M.R.S.A. § 1061(5), including, without limitation:

a.      Sanasy engaged in wrongful conduct that adversely and materially affected the business of Thai Lotus Restaurant;

b.      Sanasy willfully or persistently committed a material breach of the partnership agreement or of a duty owed under 31 M.R.S.A. § 1044 to the Thai Lotus Restaurant or the other partners thereof; and/or

c.      Sanasy engaged in conduct relating to the partnership business that makes it not reasonably practicable for the Graciano Plaintiffs to carry on the business of Thai Lotus Restaurant in partnership with Sanasy.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.      Order that Defendant Sanasy be expelled from the partnership by judicial determination pursuant to 31 M.R.S.A. § 1061(5);

B.      Order that Defendant Sanasy return at once to the Plaintiffs all property and assets in her possession, custody or control that belong to the Plaintiffs and/or over which Plaintiffs have a right of possession and control;

C.      Order that all assets of the partnership be awarded and otherwise set aside to the Graciano Plaintiffs;

D.      Order Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs; and

E.      Award such other and further relief as is just and proper.

## COUNT IX

### Dissolution of Partnership by Judicial Determination
### 31 M.R.S.A. §§ 1081(5)
*Against Defendant Khone Sanasy*

147.    Plaintiffs repeat and restate the allegations in paragraphs 1-146 as if fully set forth herein.

148.    As a result of Defendant Khone Sanasy's misconduct conduct set forth in this Complaint, including without limitation the Fact section and Counts I-III hereof, legal grounds have been established for the dissolution of partnership known as Thai Lotus Restaurant by judicial determination pursuant to 31 M.R.S.A. § 1081(5), including, without limitation:

a.      That the economic purpose of Thai Lotus Restaurant has been unreasonably frustrated;

b.     That Defendant Khone Sanasy has engaged in conduct relating to the business of the Thai Lotus Restaurant that makes it not reasonably practicable to carry on that business in partnership with Defendant Sanasy; and/or

c.     It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.     Order that the Thai Lotus Restaurant by dissolved by judicial determination pursuant to 31 M.R.S.A. § 1081(5);

B.     Order that Defendant Sanasy return at once to the Plaintiffs all property and assets in her possession, custody or control that belong to the Plaintiffs and/or over which Plaintiffs have a right of possession and control;

C.     Order that all assets of the partnership be awarded and otherwise set aside to the Graciano Plaintiffs;

D.     Order Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs; and

E.     Award such other and further relief as is just and proper.

### COUNT X
### *Interference with Contractual Relations*
### *(Against Defendants Sanasy and Weydt)*

149.     Plaintiffs repeat and restate the allegations in paragraphs 1-148 as if fully set forth herein.

150.     The Plaintiffs had existing contractual relationships with the following parties: (a) the Waterstone-Spruce Creek Defendants; (b) the Take Out Guys; and (c) Bank of America.

151.    The Graciano Plaintiffs had an existing contractual relationships with Plaintiff Thai Lotus and with Defendant Sanasy.

152.    Defendants Sanasy and Weydt procured the breach and/or termination of these contracts and contractual relationships through the acts constituting fraud and/or intimidation described in this Complaint.

153.    As a direct and proximate result of the Count X Defendants' acts constituting interfering with contractual relations, Plaintiffs have suffered direct and consequential harm, including but not limited to monetary losses of several hundred thousand dollars, and damage to Plaintiffs' reputation and good will in the community.

154.    The actions of the Count X Defendants set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such fraudulent actions.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Order that the Count X Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs;

B.    Order that the Count X Defendants pay punitive damages to the Plaintiffs; and

C.    Award such other and further relief as is just and proper.

## COUNT XI
### Intentional Misrepresentation
*(Against Defendants Waterstone, Spruce Creek and Spruce Creek Ground Tenant)*

155.    Plaintiffs repeat and restate the allegations in paragraphs 1-154 as if fully set forth herein.

156.     Waterstone, for itself and as agent for Defendants Spruce Creek and Spruce Creek Ground Tenant (the "Count XI Defendants"), made a series of knowingly false and/or misleading representations and assurances to Plaintiffs, including, without limitation, the following:

a.     its representation to the Graciano Plaintiffs on March 2, 2018 that it had not made any promises, assurances or commitments to Defendants Sanasy and Weydt in regard to a plan to take over the lease of the premises where the Thai Lotus was operating, when in fact it had;

b.     its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy and Weydt to procure a Lease or Lease assignment from Waterstone without knowledge or consent of the Graciano Plaintiffs, when in fact it did have such knowledge;

c.     its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy to sell the Thai Lotus Restaurant to Weydt without the knowledge or approval of the Graciano Plaintiffs, when in fact it did have such knowledge;

d.     its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy and Weydt to procure a Lease or Lease assignment from Waterstone without knowledge or consent of the Graciano Plaintiffs, when in fact it did have such knowledge;

e.     its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by one or more agents of Waterstone, including but not limited to Alex White and/or Neal Shalom, to aid, abet and otherwise assist Sanasy and

Weydt in forcing the Graciano Plaintiffs out of the restaurant and seizing ownership and control of the restaurant from the Graciano Plaintiffs, when in fact it did have such knowledge;

f.      its representation to the Graciano Plaintiffs on March 2, 2018 that it would consider Graciano and his counsel a willingness to consider an arrangement that would allow Graciano to regain control of his restaurant and remain in the Kittery location, when in fact, Waterstone had already promised to Defendants Sanasy and Weydt that they would be given a new lease to the existing location as soon as the current lease could be terminated so as to terminate Plaintiffs' rights to the premises; and

g.      its representation to the Graciano Plaintiffs and the Maine District Court that Graciano in court filings and during court appearance and Sanasy had substantial sums due in unpaid rent as a basis for termination of the Lease and the procurement of a judgment and writ for possession, when in fact, upon information and belief, Waterstone had already secured payment of such sums or a promise for payment of such sums from Defendants Sanasy, Weydt or Thai and I, or that sums were being held in escrow pending termination of the Lease and the entry of a judgment for possession.

157.    At the time of the above-described representations and assurances to Plaintiffs, the Count XI Defendants knew that those representations and assurances were false and/or misleading.

158.    The Graciano Plaintiffs reasonably relied upon the misrepresentations of Waterstone by, *inter alia*, refraining from seeking judicial intervention to prevent the unauthorized "sale" of the restaurant by Sanasy to Weydt and the termination of the Lease, and by not paying sums due in rent within the time allowed so as to avoid the termination

of the Lease that was used by all Defendants to facilitate the unlawful takeover and appropriation of the restaurant and the deprivation of Plaintiffs' interest therein.

159.    The fraudulent actions of the Count XI Defendants set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such fraudulent actions.

160.    As a direct and proximate consequence of Waterstone's intentional misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered harm.

161.    Under the doctrine of respondeat superior, Defendants Spruce Creek and Spruce Creek Ground Tenant are liable for the misrepresentations of Waterstone.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Order that the Count XI Defendants pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs;

B.    Order that the Count XI Defendants pay punitive damages to the Plaintiffs; and

C.    Award such other and further relief as is just and proper.

## COUNT XII
### *Negligent Misrepresentation*
*(Against Defendants Waterstone, Spruce Creek and Spruce Creek Ground Tenant)*

162.    Plaintiffs repeat and restate the allegations in paragraphs 1-161 as if fully set forth herein.

163.    Waterstone, for itself and as agent for Defendants Spruce Creek and Spruce Creek Ground Tenant (the "Count XII Defendants"), made a series of false and/or

misleading representations and assurances to Plaintiffs, including, without limitation, the following:

        a.      its representation to the Graciano Plaintiffs on March 2, 2018 that it had not made any promises, assurances or commitments to Defendants Sanasy and Weydt in regard to a plan to take over the lease of the premises where the Thai Lotus was operating, when in fact it had;

        b.      its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy and Weydt to procure a Lease or Lease assignment from Waterstone without knowledge or consent of the Graciano Plaintiffs, when in fact it did have such knowledge;

        c.      its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy to sell the Thai Lotus Restaurant to Weydt without the knowledge or approval of the Graciano Plaintiffs, when in fact it did have such knowledge;

        d.      its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by Sanasy and Weydt to procure a Lease or Lease assignment from Waterstone without knowledge or consent of the Graciano Plaintiffs, when in fact it did have such knowledge;

        e.      its representation to the Graciano Plaintiffs on March 2, 2018 that it had no knowledge of efforts by one or more agents of Waterstone, including but not limited to Alex White and/or Neal Shalom, to aid, abet and otherwise assist Sanasy and Weydt in forcing the Graciano Plaintiffs out of the restaurant and seizing ownership and

control of the restaurant from the Graciano Plaintiffs, when in fact it did have such knowledge;

        f.     its representation to the Graciano Plaintiffs on March 2, 2018 that it would consider Graciano and his counsel a willingness to consider an arrangement that would allow Graciano to regain control of his restaurant and remain in the Kittery location, when in fact, Waterstone had already promised to Defendants Sanasy and Weydt that they would be given a new lease to the existing location as soon as the current lease could be terminated so as to terminate Plaintiffs' rights to the premises; and

        g.     its representation to the Graciano Plaintiffs and the Maine District Court that Graciano in court filings and during court appearance and Sanasy had substantial sums due in unpaid rent as a basis for termination of the Lease and the procurement of a judgment and writ for possession, when in fact, upon information and belief, Waterstone had already secured payment of such sums or a promise for payment of such sums from Defendants Sanasy, Weydt or Thai and I, or that sums were being held in escrow pending termination of the Lease and the entry of a judgment for possession.

164.    At the time of the above-described representations and assurances to Plaintiffs, the Count XII Defendants knew or should have known that those representations and assurances were false, inaccurate and/or misleading.

165.    In making these misrepresentations, Waterstone was at least negligent because had a basic duty of care to Plaintiffs to be accurate in its representations and avoid making misstatements of fact or statements that it knew or should have known were false, inaccurate or misleading.

166.    The Graciano Plaintiffs reasonably relied upon the misrepresentations of Waterstone by, inter alia, refraining from seeking judicial intervention to prevent the unauthorized "sale" of the restaurant by Sanasy to Weydt and the termination of the Lease, and by not paying sums due in rent within the time allowed so as to avoid the termination of the Lease that was used by all Defendants to facilitate the unlawful takeover and appropriation of the restaurant and the deprivation of Plaintiffs' interest therein.

167.    As a direct and proximate consequence of Waterstone's negligent misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered harm.

168.    Under the doctrine of respondeat superior, Defendants Spruce Creek and Spruce Creek Ground Tenant are liable for the misrepresentations of Waterstone.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Order that the Count XII Defendants pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs; and

B.    Award such other and further relief as is just and proper.

## COUNT XIII

### *Interference with Contractual Relations*
*(Against Defendants Waterstone, Spruce Creek and Spruce Creek Ground Tenant)*

169.    Plaintiffs repeat and restate the allegations in paragraphs 1-168 as if fully set forth herein.

170.    The Plaintiffs had existing contractual relationships with the following parties: (a) the Waterstone-Spruce Creek Defendants; (b) the Take Out Guys; and (c) Bank of America.

171.    The Graciano Plaintiffs had an existing contractual relationships with Plaintiff Thai Lotus and with Defendant Sanasy.

44

172.    Defendant Waterstone procured the breach and/or termination of these contracts and contractual relationships through the acts constituting fraud described in this Complaint.

173.    As a direct and proximate result of the Defendant Waterstone's acts constituting interfering with contractual relations, Plaintiffs have suffered direct and consequential harm, including but not limited to monetary losses of several hundred thousand dollars, and damage to Plaintiffs' reputation and good will in the community.

174.    The actions of the Defendant Waterstone set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such fraudulent actions.

175.    Under the doctrine of respondeat superior, Defendants Spruce Creek and Spruce Creek Ground Tenant are liable for the misrepresentations of Waterstone.

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Order that the Count XIII Defendants to pay such compensatory and consequential damages to Plaintiffs as are appropriate, plus interest and costs;

B.    Order that the Count XIII Defendants pay punitive damages to the Plaintiffs; and

C.    Award such other and further relief as is just and proper.

## COUNT XIV
### *Civil Conspiracy*
### *(Against All Defendants)*

176.    Plaintiffs repeat and restate the allegations in paragraphs 1-175 as if fully set forth herein.

177.    All Defendants named in this Complaint (the Count XIV Defendants) acted in concert and combination with a common design to defraud Plaintiffs, and steal and otherwise convert monies and other property belonging to Plaintiffs.

178.    Defendants engaged in numerous acts and omissions in furtherance of that conspiracy, which include all the acts and omissions set forth in the Fact section of this Complaint and Counts I-XI hereof.

179.    As a direct and proximate result of the conspiratorial actions and omissions of the Count XIV Defendants, Plaintiffs have suffered direct and consequential harm, including but not limited to hundreds of thousands of dollars in monetary losses, and damage to Plaintiff's reputation and good will in the community and the industry.

180.    The wrongful actions of Defendant set forth herein constitute actual malice and/or malice implied.  As a result, Plaintiffs are entitled to punitive damages in addition to compensatory and consequential damages arising from such wrongful actions.

181.    As a result of their actions and omissions constituting civil conspiracy under Maine law, each of the Count XIV Defendants is liable for the tortious conduct of each of the other Count XIV Defendants, including but not limited to the tortious conduct described in Counts III-VI of this Complaint.

WHEREFORE, Plaintiffs respectfully requests that this Court:

   A.  Award such compensatory damages to Plaintiff as are appropriate, plus interest and costs;

   B.  Order that the Count XIV Defendants pay punitive damages to the Plaintiffs; and

   C.  Award such other and further relief as is just and proper.

        GRACIANO INC., JOSE GRACIANO,
        and THAI LOUTS RESTAURANT,
        Plaintiffs,

        By their counsel,

Dated: September 14, 2018     /s/ John H. Branson

        John H. Branson, Esq.
        BRANSON LAW OFFICE, P.A.
        482 Congress Street, Suite 304
        P.O. Box 7526
        Portland, Maine 04112-7526
        (207) 780-8611
        jbranson@bransonlawoffice.com